UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

SONNY LAMARR PHILLIPS,

Defendant.
_____/

Case No. 14-cr-20611

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
DAVID R. GRAND

**OPINION AND ORDER GRANTING IN PART DEFENDANT'S MOTION TO SUPPRESS ORAL STATEMENTS [30], AND DENYING DEFENDANT'S MOTIONS TO EXCLUDE EXPERT TESTIMONY [41] AND TO SUPPRESS EVIDENCE OBTAINED DURING THE COURSE OF SEIZURE [55]**

**I. INTRODUCTION**

Sonny Lamarr Phillips ("Defendant") is charged in a one-count Indictment for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). *See* Dkt. No. 10. On February 19, 2015, the Defendant filed a Motion in *Limine* to Exclude or to Suppress Oral Statements. *See* Dkt. No. 30. On March 18, 2015, the Defendant moved to Exclude or Limit Expert Testimony and, in the alternative, for Additional Discovery and/or a *Daubert* Hearing. *See* Dkt. No. 41. On July 20, 2015, the Defendant Moved to Suppress Evidence Obtained as a Result of Unlawful Seizure. *See* Dkt. 55. On the same day, the Defendant moved for an Order for the Government Agents to Retain Rough Notes. *See* Dkt. No. 54.

On October 29, 2015, the parties reached a stipulated agreement with regard to the Motion for the retention of rough notes. *See* Dkt. No. 69. Presently before the Court are Defendant's remaining three Motions in *Limine*. For the reasons discussed below, the Motions are **GRANTED IN PART** and **DENIED IN PART.**

## II. BACKGROUND

The allegations contained in the Indictment stem from Defendant's arrest by Detroit Police Officers Brandon Shortridge ("Shortridge"), Nicholas Dedeluk ("Dedeluk"), and Darius Shepherd ("Shepherd"). Defendant was arrested on September 8, 2014, around 9:45 p.m., in an area just north of Comerica Park in Detroit, Michigan. According to a Detroit Police Department Activity Log ("DPD Arrest Report") and a Report of Investigation from the Bureau of Alcohol, Tobacco, Firearms and Explosives at the United States Department of Justice ("ATF"), Officers Shortridge, Dedeluk, and Shepherd were on what they describe as routine patrol at approximately 9:40 p.m. Around approximately 9:43 p.m., the Officers were purportedly in a marked scout car in the area of Wilkins Street ("Wilkins") and Beaubien Street ("Beaubien") in the city of Detroit. The scout car was equipped with video cameras, which capture limited images looking out from the front windshield, and also looking back into the backseat and out through the back windshield. The scout car also has an audio recorder inside.

While traveling eastbound on Wilkins, Officer Shortridge explains in his report that he observed the Defendant walking towards a parked Ford Explorer. Officer Shortridge explains that he also observed what he believed to be "the handle of a black semi-auto handgun protruding from [Defendant's] right front vest pocket."

Officer Shortridge informed his "crew" of what he observed, and they exited the scout car. According to the DPD Arrest Report, upon seeing the officers, the Defendant ran. While the Defendant ran, Officer Shortridge writes that he observed a "black semi-auto hand gun fall from [the Defendant's] vest pocket." Officer Shortridge's report states that he recovered the handgun.

According to the DPD Arrest Report, the Defendant ran westbound on Wilkins and was eventually cornered, seized, and "detained" by Officer Dedeluk just south of Erskine Street and

-2-

east of John R. Street. The Defendant purportedly discarded his vest and shirt during the chase. While the Defendant was detained, Officer Dedeluk questioned him regarding whether Defendant "had a valid [Concealed Pistol License (CPL)]." Phillips answered "no."

At 9:50 p.m., the Defendant was placed inside the back of the police scout car. In the car, Mr. Phillips appears on the video to be sweating and panting after his run from the police. Additionally, the Defendant leans forward to wipe his brown on the back of the car seat. At 9:52 p.m., while alone in the car, the Defendant allegedly shouts: "Fuck!" A few minutes later an officer approaches the car, asks for Defendant's name and tells the Defendant to sit back.

At 9:56 p.m., Officer Shortridge enters the front seat. Officer Shortridge was joined by Officers Dedeluk and Shepard. The officers did not give the Defendant his *Miranda* warnings. Nevertheless, on the drive to the Detroit Detention Center ("DDC") the officers did ask the Defendant questions about his age, criminal history, and the location of his discarded vest. The DPD Arrest Report indicates that the officers arrested the Defendant and that the Defendant was taken to the Detroit Detention Center without incident.

### III. LEGAL STANDARD

A motion *in limine* refers to "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984). The purpose of a motion *in limine* is to eliminate "evidence that is clearly inadmissible for any purpose" before trial. *Ind. Ins. Co. v. GE*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). A district court rules on evidentiary motions *in limine* "to narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999). The guiding principle is to "ensure evenhanded and expeditious management of trials." *Ind. Ins. Co.*, 326 F. Supp. 2d at 846.

Although neither the Federal Rules of Evidence, nor the Federal Rules of Civil Procedure explicitly authorize a court to rule on an evidentiary motion *in limine*, the Supreme Court has allowed district courts to rule on motions *in limine* "pursuant to the district court's inherent authority to manage the course of trials." *See Luce*, 469 U.S. at 41 n.4.

A district court should grant a motion to exclude evidence *in limine* "only when [that] evidence is clearly inadmissible on all potential grounds." *Ind. Ins. Co.*, 326 F. Supp. 2d at 846. In cases where that high standard is not met, "evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *Id*. Denial of a motion to exclude evidence *in limine* does not necessarily mean that the court will admit the evidence at trial. *See Luce*, 469 U.S. at 41. "[E]ven if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Id*. at 41–42.

### IV. DISCUSSION

#### A. Defendant's Motion to Suppress Evidence Obtained During The Course of Seizure Should Be Denied

The Defendant has moved to suppress the evidence that was obtained during the course of the "seizure of his person." Dkt. No. 55 at 1. The Defendant argues that the police did not have sufficient reasonable suspicion to execute a valid *Terry* stop when they began chasing the Defendant, and all evidence found afterward should be suppressed.

Defendant, in his brief, admits that *California v. Hodari D.*, 499 U.S. 621 (1991) and *Illinois v. Wardlow*, 528 U.S. 199 (2000) cut against his argument. *See* Dkt. No. 55 at 2 (Pg. ID No. 209). However, Defendant argues that this case was distinguishable because the Defendant's gun dropped from his person inadvertently. *See* Dkt. No. 66 at 2 (Pg. ID No. 280). This however is not a relevant distinction. *Hodari D.* makes no distinction between intentional and inadvertent

abandonment of evidence during flight. *Hodari D.* focuses instead on the moment when a suspect becomes seized, thus triggering the Fourth Amendment. *Hodari D.*, 499 U.S. at 630 ("[S]ince [the Defendant] did not comply with [the officer's commands] he was not seized until he was tackled."). Here, the gun was recovered while the Defendant was fleeing, and thus it is not subject to Fourth Amendment protection. *Id.* (stating that the evidence, "abandoned while [the Defendant] was running was in this case not the fruit of a seizure.") *Id.* Therefore, the Motion will be denied.

### B. Defendant's Request to Exclude Expert Testimony, or in the Alternative, for a Daubert Hearing Should Be Denied

Defendant moves for the exclusion of the proposed expert testimony of Oakland County Forensic Laboratory Specialist Robert F. Koteles, Jr. "because, pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), the notice provided by the Government provides no basis for his opinion." *See* Dkt. No. 41 at 1 (Pg. ID No. 156). In the alternative, the Defendant requests for "information regarding the 'bases and reasons' for Koteles' opinion and, if necessary" a *Daubert* hearing. *Id.*

#### a. Defendant's Motion to Exclude

Defendant argues "[t]he notice provided by the Government does not provide sufficient information, pursuant to FRE 702, for the Court to conclude whether [Government's finger print expert, Robert] Koteles' opinion" is admissible. *Id.* at 7 (Pg. ID No. 162). The Government argues that the notice complies with Rule 16 of the Federal Rules of Criminal Procedure, and additionally that there is "no requirement that an expert notice under Rule 16(a)(1)(G) must satisfy FRE 702.

While Defendant is correct that Rule 16 does not require the notice to comply with Rule 702, Rule 16(a)(1)(G) does state:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. . . . The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. Pro. 16(a)(1)(G). A violation of this rule *may* result in suppression of the evidence at issue. *U.S. v. Maples*, 60 F.3d 244, 246 (6th Cir. 1995); *see also* Fed. R. Crim. Pro. 16(d)(2)(C).

Here, the notice provided is somewhat lean. In particular, the Defendant believes that the notice does not give an adequate description of the basis of the opinion. Dkt. No. 41 at 1 (Pg. ID No. 156) ("[T]he notice provided by the Government provides no basis for his opinion that the likelihood of obtaining a fingerprint of comparable value 'is usually less [than] 5%.").

The Court finds that Mr. Koteles will testify that there was "not enough of a latent print [on the firearm] to make a comparison" to Defendant's fingerprints. Dkt. No. 41 (Exhibit 2) (Pg. ID No. 166). The Court also finds that Mr. Koteles will testify that "the likelihood of obtaining a fingerprint of comparable value on a handgun is usually less than 5%." *Id.* It appears that this is a conclusion reached from the witness's personal experience. Considering that the notice provided the witness's Curriculum Vitae, and also explained that the witness has "examined hundreds of firearms and firearms components in his career," *Id.*, the Court finds that the Government has provided sufficient basis for his opinion. Therefore the Motion fails on this ground.

### b. *Defendant's Alternative Motion for Further Discovery and/or a Daubert hearing*

In the alternative, Defendant also moves the Court to conduct a *Daubert* hearing, or provide for further discovery, to determine the admissibility of the Government's expert

testimony on the probability of finding a fingerprint of comparable value on a gun. The Government does not directly dispute the Motion, but implies that it is unnecessary. Dkt. No. 62 at 6.

Rule 702 of the Federal Rules of evidence codifies the central holding of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). *Lokai v. Mac Tolls, Inc.*, 2007 WL 1666025 (S.D. Ohio 2007). There are four factors the trial court may employ in determining whether expert testimony is reliable: (1) whether the theory has been tested; (2) whether it has been subject to peer review; (3) whether a technique has a potential rate of error; and (4) whether the theory is generally accepted within the scientific community. *Daubert*, 509 U.S. at 592-594.

The above factors are neither definitive, nor exhaustive, and may or may not be pertinent to the assessment in any particular case. *See Kumho Tire v. Carmichael*, 526 U.S. 137, 141 (1999); *see also In re Scrap Metal,* 527 F.3d 517, 529 (6th Cir. 2008) (noting the factors "may be tailored to the facts of a particular case," and "should be applied only where they are reasonable measures of the reliability of expert testimony.") (quotation marks and citations omitted). Thus, the trial court has broad latitude to determine whether these factors are reasonable measures of reliability in a particular case. *See id.* at 153; *see also In re Scrap Metal*, 527 F.3d at 529 (noting that the test for reliability is flexible, and the *Daubert* factors do not constitute a definitive checklist or test and may not be dispositive in every case.).

In fulfilling its "gatekeeping" duties the Court is not required to hold an actual evidentiary/*in limine* hearing to comply with *Daubert*; however, the Court must make a determination of a proposed expert's qualifications and an assessment of the relevance and reliability of his proffered testimony. *See Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999); *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000); *Morales v. American Honda*

*Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998); *cf., Kumho Tire*, 526 U.S. at 152 (noting abuse of discretion standard applies to the trial court's decision as to whether a hearing is needed to determine reliability of an expert).

Ultimately, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *GE v. Joineri*, 522 U.S. 136, 146 (1997). Nevertheless, it is important to note that the "rejection of expert testimony is the exception, rather than the rule[.]" *In re Scrap Metal*, 527 F.3d at 530.

Here, the notice stated that Mr. Kotales would be testifying to the general probability of success in fingerprint analysis. Defendant however points to the fact that the witness is not a statistician, and has not explained how he reached this conclusion. Dkt. No. 41 at 7 (Pg. ID No. 162). At the hearing however, counsel for the Government assured the Court that the witness's conclusion would be framed and limited to the witness's own experience. There is generally no problem with a witness testifying to one's own personal experience, so long as it is relevant. *See* Fed. R. Evid. 602; *see also* Fed. R. Evid. 701. Thus, it wouldn't be a problem for Kotales to briefly explain that, in his own experience, failing to obtain a good fingerprint was a relatively common occurrence. On the other hand, testimony about the general probability of an event has been more problematic. *People v. Collins*, 68 Cal. 2d 319, 320 (1968) ("the testimony as to mathematical probability infected the case with fatal error and distorted the jury's traditional role of determining guilt or innocence according to long-settled rules.").

Seeing that the proposed testimony falls under Federal Rules of Evidence 602 and 701, this Motion is denied. However, should the witness's testimony exceed the scope of the witness's own experience, the Defendant is encouraged to renew the objection.

### C. Defendant's Motion to Suppress Statements Should Be Denied

Finally, Defendant argues that the statements made to the police officers, specifically that he did not own a CPL, should be suppressed because he did not receive *Miranda* warnings. The Sixth Circuit has explained that "there are three types of permissible encounters between the police and citizens." *United States v. Waldon,* 206 F.3d 597, 602 (6th Cir. 2000). The first encounter is "the consensual encounter, which may be initiated without any objective level of suspicion[.]" *Id.* (citation omitted). The second type of encounter is "the investigative detention, which, if nonconsensual, must be supported by a reasonable, articulable suspicion of criminal activity[.]" *Id.* (citation omitted). The last type of encounter is "the arrest," which the Sixth Circuit has labeled as "valid only if supported by probable cause." *Id.* (citation omitted).

Here, neither party argues that the encounter between the Defendant and the officers in was a casual encounter. However, the Government does contend that the stop in this case was an investigative detention for which *Miranda* does not apply. *See* Dkt. No. 39 at 9 (Pg. ID No. 134). An investigative detention occurs when an officer detains an individual who is reasonably suspected of criminal activity, questions the person briefly, and "conduct[s] a carefully limited search of the outer clothing . . . in an attempt to discover weapons. . . ." *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Such investigatory stops are known as *Terry* stops in our legal jurisprudence.

In a *Terry* stop "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's

suspicions." *Berkemer v. McCarty,* 468 U.S. 420, 439 (1984). The Sixth Circuit has noted that "[t]he very nature of a *Terry* stop means that a detainee is not free to leave during the investigation, yet is not entitled to *Miranda* rights." *United States v. Swanson,* 341 F.3d 524, 528 (6th Cir. 2003) (citing *Berkemer,* 468 U.S. at 439–41).

Thus, a discussion of *Miranda* is unnecessary if the officers simply conducted an investigatory *Terry* stop, as the Sixth Circuit has held repeatedly that an individual subjected to a *Terry* stop is not in custody for the purposes of *Miranda. See*, *e.g.*, *Swanson*, 341 F.3d at 530-31; *United States v. Ozuna*, 170 F.3d 654, 657-58 (6th Cir. 1999); *United States v. Salvo,* 133 F.3d 943, 949 (6th Cir. 1998).

"In applying Supreme Court precedent to questions of whether a defendant was 'in custody' for *Miranda* purposes, the Courts of Appeals have relied on a totality of circumstances approach to determine 'how a reasonable man in the suspect's [*sic*] position would have understood the situation.' " *Salvo*, 133 F.3d at 948 (quoting *United States v. Phillip*, 948 F.2d 241, 247 (6th Cir. 1991)); *see also id.* ("[C]ourts . . . may inquire as to whether a reasonable person in that suspect's particular circumstances would have felt free to leave."). In applying the totality of the circumstances test, the Sixth Circuit considers the following factors when determining whether an interrogation was of a custodial nature: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (citing *United States v. Panak,* 552 F.3d 462, 465 (6th Cir. 2009)). The Court must use these factors to determine whether the restraint exercised on the Defendant ever reached the level

associated with "formal arrest or a coercive context tantamount to custody." *Salvo*, 133 F.3d at 953.

> *a. The Defendant was not in custody for the single question regarding the CPL, and Miranda was not required during this brief investigatory stop.*

All three officers indicated that they spotted the Defendant with a gun in his vest. Moreover, it is not disputed that the Defendant ran upon encountering the officers. Given these facts, the Court finds that the officers had reasonable suspicion to believe the Defendant had committed a crime when they finally apprehended the Defendant.

The Court's attention focuses on the disputed conduct of the officers, which begins with the officers handcuffing the Defendant and questioning whether the Defendant possessed a CPL. The critical inquiry is whether this conduct amounted to a "formal arrest or a coercive context tantamount to custody." *Salvo*, 133 F.3d at 953. The Court finds that it does not.

As previously discussed, the Court is to apply a four-part totality of the circumstances test, when considering whether an interrogation was of a custodial nature. *See Hinojosa*, 606 F.3d at 883. As for the first factor—the location of the interview—the Court notes that the Defendant was questioned about the CPL in public. This factor weighs in favor of the Government and a finding that the Defendant was not in custody. *See Berkemer*, 468 U.S. at 438.

As for the second factor—the length and manner of the questioning—the Court notes the length of questioning was very short and involved a single question regarding a CPL. Pursuant to Michigan law, when stopped, an individual with a CPL is required to immediately disclose to an officer that he or she is carrying a pistol upon his or her person. *See* Mich. Comp. Laws § 28.425f(d). Here, the Defendant stated nothing once stopped. This, coupled with the Defendants attempt to flee upon encountering the officers, bolsters the officers contention that they had reasonable suspicion to believe a crime was committed. In light of these facts, the Court also

finds that this factor weighs in favor of the Government. *See Berkemer*, 468 U.S. at 439 (noting that in a *Terry* stop "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.").

However, the third factor—whether there was any restraint on the individual's freedom of movement—weighs in favor the Defendant and a finding that the Defendant was in custody. Here, the Defendant had an obvious restraint on his freedom of movement as he had just been chased and handcuffed in order to prevent his movement. Similarly, the fourth inquiry—whether the individual was told that he did not need to answer the questions—weighs in favor of the Defendant, as there is no indication the officers informed him whether he had to answer the officers' questions.

In sum, the questioning of the Defendant regarding CPL is a close call as the four factors are split in favor of the Government and the Defendant. *Cf. United States v. Holt,* No. 10-CR-20629, 2011 WL 835924, at *5 (E.D. Mich. Feb. 18, 2011) ) ("The balance might be closer if the third factor—whether his freedom of movement was restrained—was also in Defendant's favor."), *report and recommendation adopted,* No. 10-20629, 2011 WL 844941 (E.D. Mich. Mar. 8, 2011); *United States v. Hurston*, No. 13-20495, 2014 WL 1207849, at *4 (E.D. Mich. Mar. 24, 2014) (finding it was not a close call because "questioning on the street in a public place, with no arrest, no handcuffs, no coercion—does not amount to custodial interrogation.").

A closer look at the situation, however, tips the balance in favor of the Government. The Court finds that the restraint on the Defendant in this stop was warranted given the Defendant's actions upon encountering the officers. Undoubtedly, handcuffing the Defendant was a restraint on his freedom of movement. Even so, the Sixth Circuit has repeatedly noted that "'the use of

handcuffs [does not] exceed the bounds of a *Terry* stop, so long as the circumstances warrant that precaution.'" *United States v. Foster*, 376 F.3d 577, 587-88 (6th Cir. 2004) (quoting *Houston v. Clark County Sheriff Deputy John Does 1–5,* 174 F.3d 809, 815 (6th Cir. 1999)).

Here, the officer's use of handcuffs was objectively reasonable given the Defendant's attempt to flee upon encountering the police. *Kowolonek v. Moore*, 463 F. App'x 531, 536 (6th Cir. 2012) ("[A] subject's attempt to flee or demonstrated flight risk may render handcuffing and detention in a cruiser objectively reasonable."); *see also Brown v. Lewis*, No. 14-1392, 2015 WL 794705, at *9 (6th Cir. Feb. 26, 2015) (citing *United States v. Jacob,* 377 F.3d 573, 579–80 (6th Cir. 2004) ("[A]n attempt to flee could justify the use of handcuffs or another form of detention to prevent additional flight during the investigatory stop.")); *see also United States v. Caruthers*, 458 F.3d 459, 468-69 (6th Cir. 2006) (finding no *Terry* violation in part because suspect presented flight risk).

All things considered, the Court concludes that the brief post-stop, pre-arrest question of the Defendant was lawful because the Defendant was not in custody so as to require *Miranda* warnings. *See United States v. Bradshaw,* 102 F.3d 204, 212 n. 19. (6th Cir. 1996) (stating it is inappropriate, "in the quietude of our chambers, to second-guess standard police procedure and [ ] on-the-scene judgment."). Accordingly, the Motion to suppress the pre-arrest statements is denied.

> b. *Miranda does not bar Defendant's statements and actions while he was alone in the police car.*

As the United States notes, "[w]hether [Defendant] was detained—as the cases hold—or arrested and in custody as he claims, none of his recorded reactions or exclamations while alone in the police car are covered by *Miranda*." Dkt. No. 39 at 17. In order "for the *Miranda* doctrine

to apply, *both* custody and interrogation must exist." *United States v. Magana*, 70 F. App'x 859, 863 (6th Cir. 2003) (citing *Berkemer,* 468 U.S. at 434).

The video showing the actions and exclamations of the Defendant while alone in the car do not constitute interrogation because his actions were not in response to any actions or questions on behalf of law enforcement. *See Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S. Ct. 1682, 1690, 64 L. Ed. 2d 297 (1980) ("[T]he definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.") (emphasis in original); *cf. United States v. Collins*, 683 F.3d 697, 703 (6th Cir. 2012) (quoting *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003), to state "'[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected' by the holding in *Miranda.*"). Accordingly, given the facts, the Court finds that *Miranda* does not bar Defendant's statements and actions while he was alone in the police car. *See United States v. Gossett*, No. 13-5558, 2015 WL 127796, at *5 (6th Cir. Jan. 8, 2015).

> *c. Miranda Was Not Required for the Officers' Administrative Questions. However, Miranda Was Required for the Questions Involving the Defendant's Criminal History And the Location of Evidence.*

The Government concedes that once the Defendant was in the police car in route to the DDC with all three officers he was "in custody for *Miranda* purposes." Dkt. No. 39 at 19. Nevertheless, the Government maintains "*Miranda* does not prevent [] the officers from asking [Defendant] biographical questions about his age, criminal history, or the location of his discarded vest[.]" *Id.*

-14-

The Court agrees that the officers' question regarding the Defendant's age is not barred by *Miranda* pursuant to the "booking exception" for administrative questions. *See United States v. Pacheco-Lopez*, 531 F.3d 420, 423 (6th Cir. 2008).

However, the Sixth Circuit has specifically noted that the booking exception to *Miranda* "requires the reviewing court to carefully scrutinize the facts, as '[e]ven a relatively innocuous series of questions may, in light of the factual circumstance and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response.'" *Id.* (quoting *United States v. Avery,* 717 F.2d 1020, 1025 (6th Cir. 1983)).

Here the Court finds the officers crossed the line by asking questions of an investigatory nature as opposed to questions merely involving the processing of an arrest. Based on the facts presently before the Court, questions about the Defendant's criminal history and the location of evidence mandated a *Miranda* warning because these questions were "reasonably likely to elicit an incriminating response[.]" *Innis*, 446 U.S. at 301.

Questioning a defendant about the location of evidence constitutes interrogation under *Miranda*. *See United States v. Downing*, 665 F.2d 404, 406 (1st Cir. 1981) (finding that the "limited" booking exception does not "encompass all questions asked during the booking process," and stating definitively: "We think it clear that when appellee was asked . . . where his plane was located, this constituted 'express questioning' and therefore satisfied the Court's definition of 'interrogation'."); *Avery*, 717 F.2d at 1025 n.1 ("[T]he questions in *Downing* were much more likely to elicit an incriminating response from the defendant[.]").

Similarly, the Court finds questioning the defendant about his criminal history also constitutes interrogation, because there is a distinction between asking about a defendant's personal history—which the Court would agree is a routine innocuous booking question—and a

-15-

defendant's criminal history. *Compare United States v. Broadus*, 7 F.3d 460, 464 (6th Cir. 1993) (finding, generally, that questions posed "to secure the personal history data necessary to complete the booking process" do not fall within this definition and are exempt from the *Miranda* requirements), *with Avery*, 717 F.2d at 1024 (suggesting *Miranda* safeguards are only unnecessary when "the record indicates that the questions were part of a routine procedure to secure biographical data . . . [but] *did not relate, even tangentially, to criminal activity*.") (emphasis added).

Looking at the facts here, the officers knew that the Defendant was at one point wearing a vest and questioned him about the location of that evidence. Asking questions about the location of the vest was relevant to the officer's investigation, and cannot be described as related to the booking process. This fact alone, implicates *Miranda*'s concern about the danger of coercion resulting from "the interaction of custody and official interrogation." *Pacheco-Lopez*, 531 F.3d at 424 (quoting *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990)).

Furthermore, the nature of the officers' questioning also supports the Court's conclusion that the booking exception is not fully applicable in this case. The Sixth Circuit has noted that "[a]pplication of the booking exception is most appropriate at the station, where administrative functions such as bookings normally take place." *Pacheco-Lopez*, 531 F.3d at 425 (noting that "[i]n the majority of cases where we have applied the booking exception we have done so for questioning that occurred at the police station.") (internal citation omitted).

Here the Defendant was questioned immediately after apprehension by three police officers—one sitting directly beside him—inside a police vehicle while the Defendant was being transported to the DDC. To extend the booking exception to this situation—where the officers

-17-

were still in the investigatory stage of criminal proceedings—"would undermine the protections that *Miranda* seeks to afford to criminal suspects." *Id.*

In sum, the Defendant's responses to the officer's questions regarding his criminal history and the location of his vest resulted from a "custodial interrogation," not biographical questioning subject to the booking exception. Consequently, Defendant's *Miranda* rights were implicated before the officers actually read the warning. Because the police did not administer the *Miranda* warning for these initial questions, the answers are "presumed compelled" and "excluded at trial in the [Government's] case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

## V. CONCLUSION

For the reasons discussed above,

IT IS ORDERED that the Motion to suppress oral statements [30] is **GRANTED IN PART** and **DENIED IN PART.**

IT IS FURTHER ORDERED that the remaining Motions [41, 55] are **DENIED**.

Dated: November 12, 2015　　　　　　　　　　　/s/Gershwin A Drain  
Detroit, MI　　　　　　　　　　　　　　　　　HON. GERSHWIN A. DRAIN  
　　　　　　　　　　　　　　　　　　　　　　United States District Court Judge